# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  10-20070** |
| | ) | |
| **FORREST EVERETT,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

## MEMORANDUM AND ORDER

This matter is before the Court on defendant Forrest Everett's motion to suppress

(doc. 22), challenging the admissibility of statements made by Mr. Everett to law

enforcement on October 22, 2008.  The government filed a response to Mr. Everett's

motion on October 10, 2010 (doc. 26), and the Court held hearings on the motion on

October 28, 2010, November 26, 2010, and December 15, 2010 pursuant to *Jackson v.

Denno*, 378 U.S. 368 (1964).  At the conclusion of the hearings, the Court took the matter

under advisement.  After thoroughly considering the parties' arguments and the evidence,

for the reasons set forth below, the Court denies Mr. Everett's motion.

## FINDINGS OF FACT

On February 7, 2008 and again on June 25, 2008, burglaries occurred at a Miller

Pharmacy in Bonner Springs, Kansas.  During the course of the two burglaries, $284.00

in cash was stolen as well as prescription drugs, including Oxycontin, Percocet, Xanax,

and Hydrocodone/APAP . The Bonner Springs Police Department conducted an investigation of the two incidents in conjunction with numerous other burglaries, thefts, and criminal damage to property that had been reported between February and September of 2008. The investigation led officers to believe that Katrina ("Katie") Chrisp and Brady Burton may have information regarding the property crimes. Upon separately interviewing Ms. Chrisp and Mr. Burton, Mr. Everett's name was mentioned in connection with the Miller Pharmacy burglaries, and in addition, in association with an August 25, 2008 arson at Legends Suzuki in Kansas City, Kansas.

Bonner Springs Detective Vickie Fogarty contacted Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Kyle Lovelady to assist in conducting an interview with Mr. Everett concerning Mr. Everett's possible involvement in the crimes. Special Agent Lovelady at the time was investigating the Legends Suzuki arson case. Officers appeared at Mr. Everett's home in Bonner Springs, Kansas on the afternoon of October 22, 2008 to ask Mr. Everett if he would accompany them to the Bonner Springs Police Department for an interview. Mr. Everett agreed to speak with the officers and rode with Detective Fogarty in her vehicle to the Bonner Springs Police Department.

Upon arriving at the station around 4:45 pm, Mr. Everett was immediately placed in a room for questioning. Also present in the room were Detective Fogarty, ATF Special Agent Lovelady, ATF Special Agent Brandon Fletcher, and Kansas City, Kansas Fire Department Battalion Chief Randy Hawkins. Detective Fogarty conversed with Mr. Everett for approximately fifteen minutes before Mr. Everett was read his *Miranda* rights.

Then Special Agent Lovelady presented to Mr. Everett an ATF "Advice of Rights and Waiver" form and read aloud to Mr. Everett the *Miranda* warnings. Mr. Everett indicated that he understood his rights and initialed each paragraph detailing the *Miranda* warnings. Special Agent Lovelady also read aloud the waiver of rights, asked Mr. Everett if he understood the waiver, and if so, would Mr. Everett agree to speak with Agent Lovelady and the Bonner Springs Police Department. Mr. Everett agreed to speak with the officers and signed the waiver form. Special Agent Fletcher also signed the waiver form as a witness.

The interrogation of Mr. Everett was directed by Detective Fogarty, with Special Agent Lovelady as the note-taker, and primarily focused on Mr. Everett's possible involvement in the August 25, 2008 Legends Suzuki fire, in which several vehicles were destroyed. Thirty to sixty minutes after Mr. Everett was read his *Miranda* rights, Detective Fogarty asked Special Agent Fletcher and Fire Chief Hawkins to leave the interview room, as it seemed the number of officers present was intimidating Mr. Everett. Special Agent Fletcher and Fire Chief Hawkins thereafter listened to the remainder of the interrogation in an adjoining office, through the open door separating the two rooms. Detective Fogarty and Special Agent Lovelady resumed the interview, and subsequent to questioning Mr. Everett with regards to the Legends Suzuki incident, turned questioning to the topic of the two Miller Pharmacy break-ins in Bonner Springs, Kansas. Notably, there was no audio or video record made of the officers' interrogation of Mr. Everett, so many of the details of the interaction is unknown.

After nearly four and a half hours of interrogation, Mr. Everett was asked to make a recorded statement, to which he agreed. The first recorded statement began at 9:27 pm and focused on the first line of questioning pertaining to the Legends Suzuki fire. Mr. Everett confessed to burning vehicles at the dealership according to the instruction and threat of others. A second statement was then recorded at 10:45 pm regarding the Miller Pharmacy burglaries. Mr. Everett conceded that he participated in the burglaries because of threats from other individuals. In addition to confessing to the two Miller Pharmacy burglaries, Mr. Everett also stated that he was involved in additional pharmacy burglaries during the relevant time period. Ultimately the two statements concluded at 11:00 pm, after which Mr. Everett was arrested and transported to the Wyandotte County Jail. Mr. Everett was charged in federal court with arson, but the charges were later dismissed for reasons unknown.

The entire interrogation of Mr. Everett lasted approximately six hours. During the interrogation, Mr. Everett was given several cigarette and bathroom breaks and was offered food and drink. At no point during the interview did Mr. Everett request an attorney or ask that the questioning cease. Mr. Everett has significant intellectual limitations. His full-scale IQ is 72, and his reading ability is at about a second grade level. Mr. Everett completed the ninth grade but dropped out of school sometime during his tenth grade year. Furthermore, during the days leading up to the October 22, 2008 interview, Mr. Everett had used methamphetamine.

**ANALYSIS**

Mr. Everett challenges both the validity of his *Miranda* waiver and the admissibility of his statements offered to law enforcement after providing a waiver. According to Mr. Everett, he did not understand the *Miranda* warnings as read to him, and therefore did not have the ability to waive his rights. Mr. Everett also contends that statements made after waiving his rights were not offered voluntarily.

## A. Miranda Warnings

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966). In *Miranda*, the Supreme Court held that, in order to protect the privilege against self-incrimination, law enforcement officers must administer prophylactic warnings regarding the privilege to any suspect subjected to custodial interrogation. *United States v. Chalan*, 812 F.2d 1302, 1306 (10th Cir. 1987) (citing *Miranda*, 384 U.S. at 44). If the warnings are not administered, the prosecution may not use statements by the suspect, whether exculpatory or inculpatory. *Id.*

*Miranda*'s protections apply only when an individual is subjected to "custodial interrogation." *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000). It was the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation. *United States v. Cook*, 599 F.3d 1208, 1213 (10th Cir. 2010) (citing *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)). When the government appears to

control the suspect's fate, the Court has assumed that there are pressures that may weaken the suspect's will. *Id.* In this case, there is no dispute that statements made by Mr. Everett were obtained during custodial interrogation, thus mandating protections afforded by *Miranda.*

The Court in *Miranda* formulated the now-familiar procedural safeguards to secure the privilege against self-incrimination:

> "A suspect must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires"

*Colorado v. Spring*, 479 U.S. 564, 572 (1987) (quoting *Miranda*, 384 U.S. at 479)). The four warnings *Miranda* requires are invariable, but the Supreme Court has not dictated the words in which the essential information must be conveyed. *California v. Prysock*, 453 U.S. 355, 359 (1981). The inquiry is simply whether the warnings reasonably conveyed to the suspect his rights as required by *Miranda*. *Florida v. Powell*, 130 S. Ct. 1195, 1203 (2010) (citing *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989)).

There is no question in this case that Mr. Everett was read warnings representative of those established in *Miranda*. The question is, rather, whether Mr. Everett sufficiently waived those rights so that the statements he made to law enforcement subsequent to his waiver may be admissible at trial.

## B. Waiver of *Miranda*

The government has the burden of proving a valid waiver by a preponderance of

the evidence.  *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008).  It is a bedrock principle that the waiver of one's Fifth Amendment privilege, in order to be valid, must be given voluntarily, knowingly, and intelligently.  *United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002).  The Court's inquiry into a waiver's validity has two dimensions: First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.  *United States v. Curtis*, 344 F.3d 1057, 1066 (10th Cir. 2003) (citing *Colorado v. Spring*, 479 U.S. at 573).

Mr. Everett challenges the final two prongs of the waiver test, contending that the waiver of rights was not knowingly and intelligently given.  Because of his intellectual limitations, Mr. Everett states he was precluded from adequately understanding the *Miranda* rights as read to him.  The Court will examine the whole record to determine whether Mr. Everett evidenced sufficient awareness and understanding for the Court to conclude his waiver of rights was knowingly and intelligently made.  *See Smith v. Mullen*, 379 F.3d 919, 933-34 (10th Cir. 2004).  The purpose of the "knowing and intelligent" inquiry is to determine whether a defendant actually does understand the significance and consequences of a particular decision.  *See Godinez v. Moran*, 509 U.S. 389, 401 (1993).

Considering all of the facts in this case, the Court concludes that the government has proved a valid waiver by a preponderance of the evidence.

There is no doubt that a defendant's mental capacity is relevant to whether or not a person could have understood both the nature of the right being abandoned and the consequences of the decision to abandon it. *See Morris*, 287 F.3d at 988. As evidence that he did not knowingly and intelligently waive his rights, Mr. Everett cites to his mental and intellectual limitations. Mr. Everett's cognitive difficulties are apparent. Dr. Forrest testified at the October 28, 2010 hearing that Mr. Everett's overall IQ is 72, a level considered borderline intellectual functioning. Furthermore, Mr. Everett's reading comprehension is at about a second-grade level. Dr. Forrest's review of the particular *Miranda* warnings read to Mr. Everett revealed that three out of five of the warnings given to Mr. Everett, to be adequately comprehended, required a ninth grade reading level or higher. Finally, in a meeting with Dr. Forrest, Mr. Everett stated that he suffers from dyslexia and attention deficit disorder with hyperactivity. Dr. Forrest testified that if Mr. Everett does in fact suffer from these additional conditions, they would affect Mr. Everett's cognitive abilities and make it difficult for him to pay attention to the *Miranda* rights read aloud to him.

In *Smith v. Mullen*, the court found that the defendant made a valid waiver even though he was brain damaged and functioning on a comprehension level of a twelve-year-old. 379 F.3d at 933. According to the court, the totality of the circumstances supported a conclusion that Mr. Smith made a knowing and intelligent waiver of his *Miranda* rights.

While Mr. Smith's intellectual functioning was limited, it was shown he understood the role of police officers and the concept of a criminal charge. *See id.* The fact that Mr. Smith's cognitive abilities mirrored those of a twelve-year-old did not alone render his waiver ineffective. *See id.* at 933-34. His memory was not wholly intact and his responses to answers came slowly, but he stated he understood his rights, he comprehended the questions officers presented, and he provided an accurate description of the crimes. Finally, the court emphasized the significance that Mr. Smith had prior experience with the criminal justice system. *Id.*

Here, like in *Smith*, the totality of the circumstances support that Mr. Everett made a knowing and intelligent waiver of his rights, in spite of his intellectual shortcomings. Mr. Everett waived his rights only after he had been informed of them both orally by Special Agent Lovelady and in writing through the "Advice of Rights" form. Special Agent Lovely read the rights aloud while Mr. Everett was permitted to follow along on the written form. Mr. Everett then indicated that he understood each warning prong of *Miranda* and initialed the corresponding paragraphs. An express written statement of waiver, such as the "Advice of Rights" form signed by Mr. Everett, is strong proof of the waiver's validity. *See United States v. Boyd*, 31 F. App'x 601, 603 (10th Cir. 2002) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). Finally, because Mr. Everett had been in contact with law enforcement on previous occasions, there is even more reason to believe he understood his constitutional rights before consenting to waive them. *See Burson*, 531 F.3d at 1259. Mr. Everett testified that the *Miranda* warnings had been

read aloud to him on a prior occasion, and during his testimony at the November 26, 2010 hearing, he was even able to recite several of the specific admonitions. Moreover, it seems when Mr. Everett waived his rights, he understood from his previous experiences the role of law enforcement and the concept of a criminal charge. The record therefore supports that the officers administered the required warnings, sought to assure that Mr. Everett understood his rights, and obtained an express written waiver prior to eliciting statements.

Mr. Everett also contends that at the time of the interrogation, he was coming down from a several day methamphetamine binge, which in combination with his intellectual challenges, severely impaired his ability to understand the *Miranda* warnings presented to him. An individual's state of intoxication will not automatically render his statements involuntary. *United States v. Muniz*, 1 F.3d 1018, 1022 (10th Cir. 1993). Rather, the test is whether the suspect's will was overborne by the circumstances surrounding the giving of a confession. *Dickerson v. United States*, 530 U.S. 428, 434 (2000).

Tenth Circuit cases shed light on what the standard is in the context of a defendant's waiver of rights while under the influence of drugs or otherwise impaired. *See Burson*, 531 F.3d at 1257. In *United States v. Curtis*, a valid waiver was found where the defendant was under the influence of marijuana, crack cocaine, and alcohol consumed earlier in the day; he looked a little "punchy;" he laid his head on the table; he closed his eyes at times, and his eyes were bloodshot. 344 F.3d 1057 (10th Cir. 2003). It was

nevertheless determined that the defendant had knowingly and intelligently waived his rights. *Id.* at 1066. The court relied particularly on the testimony of the arresting officer that the defendant was cool and calm, was able to answer questions, and appeared to be operating under his own free will. *Id.*

Similarly, in *United States v. Morris*, the Tenth Circuit concluded that the defendant knowingly and intelligently waived his *Miranda* rights, although his mental capacity was affected by pain, the effects of pain medication, and the post-traumatic stress of being shot. 287 F.3d at 989 (10th Cir. 2002). After analyzing the totality of the circumstances, the court determined that the defendant was alert and responsive during the interview, coherent in previous conversations with agents, and demonstrated that he understood the right to remain silent. *Id.* The defendant's arguments to the contrary were belied by the officers' testimony and other record evidence. *Burson*, 531 F.3d at 1258.

Finally, in *United States v. Burson*, the Tenth Circuit again upheld a waiver as knowing and intelligent where the defendant was under the influence of methamphetamine and was exhausted. The court stated that past cases reveal that a defendant must be impaired to a substantial degree to overcome his ability to knowingly and intelligently waive his privilege against self-incrimination. 531 F.3d at 1258 (citing *Smith*, 379 F.3d at 932; *Curtis*, 344 F.3d at 1066; *Morris*, 287 F.3d at 989). Where the government puts forth evidence showing that the defendant was sufficiently in touch with reality so that he knew his rights and consequences of abandoning them, the defendant must point to facts sufficient to overcome that showing. *Id.* The mere fact of drug or

alcohol use will not suffice.  *Id.*  Ultimately, the court determined that the defendant had

failed to overcome the government's evidence that he possessed the requisite level of

understanding and comprehension to knowingly and intelligently waive his rights.  *Id.*

Here, the Court does not conclude from the evidence that Mr. Everett was still

under the influence of methamphetamine or otherwise incapable of sufficient

comprehension at the time Special Agent Lovelady advised Mr. Everett of his *Miranda*

rights or when Mr. Everett signed the form acknowledging that he had been apprised of,

understood, and waived those rights.  When Mr. Everett waived his constitutional rights,

it had been hours since he had used methamphetamine, and he did not appear to be under

the influence of drugs or alcohol.  He was able to provide clear responses to questions and

engage in rational dialogue.  The testimony from Detective Fogarty, Special Agent

Lovelady, and Special Agent Fletcher at the suppression hearings indicated that Mr.

Everett was mentally and physically in command of himself at the time of his

interrogation, and that he was able to understand his situation and the consequences of his

actions.  There is no evidence how much methamphetamine had been used by Mr. Everett

or whether it was an amount typical of Mr. Everett's normal drug use.  *See Burson*, 531

F.3d 1254.  Mr. Everett conceded at the suppression hearing that he had been a regular

user of methamphetamine, and it was not unusual for him to go on a methamphetamine

"binge" for several days.  Mr. Everett did not demonstrate how the amount of drugs he

ingested prior to the evening of October 22, 2008 overcame his awareness and

understanding.  It does not follow that Mr. Everett was substantially impaired to the

degree necessary to find that he did not knowingly and intelligently waive his rights.

## C. Voluntariness of Statements

Mr. Everett argues that even if his *Miranda* waiver is found to have been valid, his statements should be suppressed, as they were made involuntarily. An inculpatory statement, to be admissible, must be made voluntarily and of the defendant's free will. *United States v. Minard*, 208 F. App'x 657, 660 (10th Cir. 2006) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). To be voluntary, a confession must be the product of essentially free and unconstrained choice by its maker. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

In the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements were involuntary. *See Minard*, 208 F. App'x at 660. The test for involuntariness is whether, considering the totality of the circumstances, the government obtained statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997). Both the characteristics of the accused and the circumstances of the interrogation are relevant to this determination. *Id.* at 226. Factors considered by the Court include the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002); *Colorado v. Spring*, 479 U.S. at 573.

13

## 1. Age, Intelligence, Education

The Supreme Court has held "coercive police activity" to be a necessary predicate to the finding that a confession was not "voluntary," regardless of a suspect's mental condition. *United States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1994) (quoting *Connelly*, 479 U.S. at 164). In cases where a defendant is mentally impaired and the officer was aware of the impairment, a confession will be suppressed as involuntary only if the officers utilized coercive measures to take advantage of the impairment. *Nickel v. Hannigan*, 97 F.3d 403, 410 (10th Cir. 1996). A diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective. *Guerro*, 983 F.2d at 1004 (citing *United States v. Crismon*, 965 F.2d 1465, 1469 (7th Cir. 1992)).

Mr. Everett's mental impairments are relevant to our scrutiny of his interrogation because they enhance his susceptibility to police coercion. *See Connelly*, 479 U.S. at 165; *Chalan*, 812 F.2d at 1308. In arguing that his intellectual disadvantages and methamphetamine use rendered his statements involuntary, Mr. Everett presents the same evidence as addressed by the Court above with regards to Mr. Everett's *Miranda* waiver. According to Mr. Everett, the totality of the circumstances supports that his statements were a result, in part, of his severe mental limitations and state of coming down from a methamphetamine high.

Based on the same considerations pertaining to Mr. Everett's intellectual ability and drug use analyzed above, the Court concludes that Mr. Everett's statements were

voluntarily given. Mr. Everett demonstrated that he understood the questions being asked by the officers and was able to respond coherently and appropriately. Furthermore, nothing about Mr. Everett's demeanor made the officers concerned that he might have been under the influence of drugs or alcohol. The evidence does not indicate that Mr. Everett was impaired such that his statements were not voluntary or that he was not operating under his own free will. *See Curtis*, 344 F.3d at 1066. Additionally, Mr. Everett had experience with law enforcement and was able to comprehend the role of law enforcement and the consequences of criminal charges.

### 2. Informed of Rights

Mr. Everett was informed of his rights by Special Agent Lovelady, both orally and in writing. As previously addressed, Mr. Everett communicated to the officers that he understood the nature of those rights by initialing each individual paragraph identifying the *Miranda* warnings. Mr. Everett afterwards chose to waive his rights and speak with officers, and he signed a waiver form to indicate his acquiescence.

### 3. Length and Nature of Interrogation

The length and nature of the interrogation were discussed in detail at the suppression hearings, and the pertinent evidence offered by each party has been carefully reviewed by the Court. While the evidence presented does not support suppression of Mr. Everett's statements, the Court notes that Mr. Everett may present evidence pertaining to details of the interview to the jury in order for the jury to make its own reliability

determinations. *See United States v. Robertson*, 19 F.3d 1318, 1322 (10th Cir. 1994).

Mr. Everett remained in police custody for the purposes of interrogation for almost six hours. Six hours of interrogation would be difficult for any defendant, regardless of his mental capacity and physical endurance. The length of the interrogation is particularly worrisome in this case, as there is little evidence detailing what took place during the majority of the six hours. Only the last portion of Mr. Everett's interview was taped, from 9:27 pm to 11 pm. Thus, what occurred during the four and a half hours of interrogation prior to Mr. Everett's recorded statement is largely unknown. Details of the unrecorded interrogation must be gleaned from the testimony of Detective Fogarty, Special Agents Fletcher and Lovelady, and Mr. Everett.

The recorded portion of the interrogation reveals that many of the questions posited by Detective Fogarty were at least leading, if not altogether suggestive, of the answer sought. Detective Fogarty corrected Mr. Everett in several instances when Mr. Everett gave the incorrect or incomplete answer. According to Special Agent Lovelady's testimony, the type of questioning reflected in the taped portion of the interrogation is reflective of the nature of the interrogation as a whole. It would therefore follow that leading questions were a part of the four and a half hours of interrogation preceding the taped testimony. Detective Fogarty, on the other hand, testified that leading questions were used primarily in the taped portion of the interview, because at that point the answers had already been received from Mr. Everett, and Detective Fogarty was merely trying to direct the taped interview to address the relevant issues to create a summary of

the earlier interrogation.

Mr. Everett also occasionally spoke in code, where he answered in opposites and said "maybe" when Detective Fogarty believed he meant to say "yes." Detective Fogarty testified that Mr. Everett explained to her that he chose to answer "maybe" when he meant "yes," for then whomever had instructed Mr. Everett to commit the crimes would not be angry with him. Detective Fogarty also stated that she was able to recognize when Mr. Everett was reversing facts or using opposites when describing situations, for she established a rapport with him and could decipher what he meant to say from his body language.

Mr. Everett contends that he merely answered the questions the way Detective Fogarty wanted and changed his answers when Detective Fogarty told him his answers were wrong. However, the government pointed out that Mr. Everett was able to give narrative answers after Detective Fogarty indicated that the answer originally offered by Mr. Everett was incorrect. This suggests that Mr. Everett had previously told Detective Fogarty a different explanation of the events. Detective Fogarty's manner of questioning, as the government suggests, was likely employed in order to facilitate the conversation and summarize Mr. Everett's previous explanation. The government also pointed out that the instances in which Detective Fogarty corrected Mr. Everett were few and far between. For the most part, Mr. Everett was able to accurately repeat the prior conversation and even offered corrections when Detective Fogarty spoke incorrectly. More importantly, according to Detective Fogarty, statements and explanations given by Mr. Everett

regarding his involvement in the crimes were corroborated by police investigation.

Furthermore, before the taped portion of the interview, Detective Fogarty had apparently come to an understanding with Mr. Everett regarding his use of "code" and understood what Mr. Everett actually meant to say. For instance, Mr Everett would nod his head when he said "maybe," indicating that he meant "yes." According to Detective Fogarty, Mr. Everett's use of code language became less frequent as the interrogation progressed and resolved itself before the taped statement. Overall, while the manner of questioning used by Detective Fogarty during the taped portion of the interview is not ideal, it is not necessarily reflective of the interrogation as a whole, and it does not follow that the interrogation method caused Mr. Everett's will to be overcome.

Further testimony from the officers at the suppression hearings served to dispel remaining apprehension regarding the four hours of unrecorded interrogation. Special Agent Lovelady described the interrogation as taking place in a polite and conversational manner. According to the officers, Mr. Everett remained alert and continued participating willingly throughout the interview. There is no evidence Mr. Everett appeared exhausted or unable to continue answering questions due to fatigue. Mr. Everett was given frequent cigarette and bathroom breaks and was offered food and drink. He at no point asked for questioning to stop or for an attorney to be present. In sum, the evidence does not support that Mr. Everett was overcome by pressure or fatigue such that his statements were made involuntarily.

### 4. Use or Threat of Physical Force

The environment in which the interview took place was not unduly coercive. The interview took place in a room large enough to adequately accommodate the interviewers. *See United States v. Smith*, 606 F.3d 1270, 1277 (10th Cir. 2010). There is no evidence that Mr. Everett was handcuffed during the interview. While the officers testified that they were armed during the interrogation, they did not brandish their weapons at any point. There is nothing to indicate that Mr. Everett was treated impolitely or touched forcefully while being interrogated.

When Mr. Everett first entered the interrogation room, four or five officers were already present. After the interview began and Detective Fogarty realized that Mr. Everett was distracted by the number of officers and in particular by Special Agent Fletcher, she removed the additional officers from the room. From that point forward, only Detective Fogarty and Special Agent Lovelady remained in the room to conduct the interview. Special Agent Lovelady testified that after the additional officers left, Mr. Everett was able to concentrate on the task at hand.

Mr. Everett also testified that Detective Fogarty had with her in the interrogation room a binder labeled with Mr. Everett's name. The first page within the binder contained a list of crimes associated with Mr. Everett. Detective Fogarty testified that it is common police practice to use evidence against a suspect during an interrogation. While the presence of the binder likely made Mr. Everett nervous, it did not intimidate or overbear Mr. Everett's will to the point of rendering Mr. Everett's statements involuntary.

## CONCLUSION

Overall, the Court's analysis of the record reveals that the tactics used by police in this case did not overbear Mr. Everett's will. *See Mullen*, 379 F.3d at 934. Because the actions of the officers were not coercive, statements made by Mr. Everett were voluntary for purposes of the Fifth Amendment. *See Connelly*, 479 U.S. at 167. Mr. Everett agreed to speak with the officers, signed a waiver of his rights, and agreed to make a recorded statement. It does not follow that Mr. Everett's will was "overborne." *Dickerson*, 530 U.S. at 434.

Mr. Everett is free to present to the jury at trial evidence of his mental condition at the time of the interview and evidence pertaining to the nature of the interview itself. *See Robertson*, 19 F.3d at1322. Such evidence will go to the weight and reliability, not to the admissibility, of Mr. Everett's statements. *Id.* For the purposes of admissibility, however, this Court concludes, based on an evaluation of the record and evidence presented at the motion hearings, that the government has met its burden of showing that both Mr. Everett's waiver of *Miranda* rights and his subsequent statements to officers were voluntarily, knowingly, and intelligently made. Mr. Everett's statements are therefore admissible.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's motion to suppress statements (doc. 22) is denied.


**IT IS SO ORDERED** this 12th day of January, 2011.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge